CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
JAN 1 6 2019
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| SYRON D. ROGERS, | ) |
| | ) |
| Plaintiff, | ) Case No. 5:17-CV-70073 |
| | ) |
| v. | ) |
| | ) |
| FREDERICK SCHILLING, | ) |
| et al., | ) By: Hon. Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendants. | ) |

## MEMORANDUM OPINION

Defendants David MacDonald, D.O. and Tanya Landrum, Health Services Administrator (collectively "Defendants") filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on November 29, 2018. ECF No. 83. The court heard argument on the motion on January 3, 2019. For the reasons stated below, the court **GRANTS** the motion for summary judgment. All counts are **DISMISSED** and this case is **STRICKEN** from the active docket.

I.

Plaintiff Syron D. Rogers ("Rogers") was an inmate at the Augusta Correctional Center ("ACC") at the time of the events giving rise to this claim. ECF No. 83-1, at 98. These events occurred mainly in March and April of 2015. Id. at 115. Rogers remains incarcerated currently. Id. Defendant Dr. David MacDonald ("Dr. MacDonald") is a family physician who is Board Certified in Family Medicine. ECF No. 83-2, at 2. Defendant Tanya Landrum ("HSA Landrum") served as the Health Services Administrator at ACC during the period giving rise to Rogers's claims. ECF No. 83-3, at 10.

These claims arise from what Rogers alleges was inadequate care and retaliation against constitutionally protected speech. Rogers was first seen at the University of Virginia Hospital ("UVA") in an off-site clinical appointment for dissecting cellulitis in the scalp area on June 12, 2014. ECF No. 83-5, at 2. He had been receiving treatment for this condition for several years. Id. On September 9, 2014, Dr. David Shonka at UVA further evaluated Rogers and noted constant drainage/discharge from the wound area. Id. at 7. Rogers was re-evaluated on February 12, 2015, when surgery and graft reconstruction were first discussed. Id. at 9. This procedure was performed on March 6. Id. A "foam bolster" was attached to the graft site during surgery to aid in short-term healing. ECF No. 83-6, at 48. Following the procedure, Rogers returned to ACC with a discharge notation that read, "We will schedule you a follow-up appointment for 3/12/15. We will remove your bolster at that time." ECF No. 83-5, at 15. A March 11, 2015 notation in ACC's medical records indicates that Dr. MacDonald was aware of this appointment. ECF No. 83-4, at 7.

Dr. Shonka issued several post-operative orders regarding Rogers, including that he not lift any weight exceeding 10 lbs. ECF No. 83-5, at 16. After Rogers's return to ACC following his surgery, he was discharged from the medical infirmary back into general population. There is some disagreement as to when this happened; Dr. MacDonald states that the discharge occurred on March 9 (ACC medical records support this) while Rogers claims he was sent back to general population as soon as he returned to ACC, the same day as his surgery. Compare ECF No. 83-7, at 45 and ECF No. 83-4, at 7 with ECF No. 83-1, at 27. Rogers was situated in a third-floor cell and had to ascend and descend stairs in order to attend meals and medical appointments. ECF No. 83-1, at 128–29.

Rogers's March 12, 2015 appointment was cancelled by UVA. On March 12 at 10:11 am, Ellen Desper, a nurse at UVA, noted in Rogers's medical record that she told a physician at ACC that Rogers's post-operative appointment with Dr. Shonka would need to be rescheduled "from 3/24 to 3/17" to remove his bolster dressing. ECF No. 83-5, at 19. Nurse Desper indicated that the ACC physician was a woman; Dr. Diane Landauer, Dr. MacDonald's colleague, was the only female physician working at ACC. ECF No. 83-2, at 2. Dr. MacDonald reviewed Rogers's medical record and saw that UVA had cancelled the March 12 appointment, as the notation "Rescheduled by UVA pending" had been added to the record. ECF No. 83-7, at 33. Dr. MacDonald also knew from Rogers's medical record that he was scheduled to be examined by Dr. Landauer the next day, on March 13. Id. There is no evidence that Dr. MacDonald saw Rogers after March 11, 2015. After that date, Rogers was treated by ACC staff physician Dr. Landauer.

On March 13, Dr. Landauer examined Rogers and noted slight turbid drainage from his thigh graft site. ECF No. 83-4, at 9. On March 19, Rogers was evaluated again by Dr. Landauer, who noticed more drainage from the scalp, but recorded that the graft site was healing well. Id. On March 20, a telephone call was made to UVA describing the increase in drainage and other symptoms. Id. at 11. A nurse at UVA asked that Rogers be brought back and recorded that he had been a no-show for his March 17 post-operative appointment. ECF No. 83-5, at 21. Rogers was brought to UVA that afternoon. Id. Dr. Landauer later noted that the skin graft "did not take" and needed surgical debridement. Id. This was performed on March 23. Id.

3

Rogers was returned to ACC on March 24 with several post-operative orders, including (again) that he should not lift over 10 lbs. for approximately 4 weeks. ECF No. 83-5, at 16. Rogers was seen several times by doctors and nurses between March 24 and June 2. ECF No. 83-4, at 13. Rogers was discharged from the medical infirmary on or about April 28, 2015 and returned to general population, but was readmitted to the medical infirmary three days later. ECF No. 83-1, at 153. On April 22, 2015, Rogers filed an offender request asserting several complaints against Nurse Carter, including that she had "assaulted" him. ECF No. 83-3, at 201. HSA Landrum spoke personally with Rogers regarding some of these complaints and responded in writing to the offender request on April 24. ECF No. 83-3, at 200–201. On June 2, Rogers was evaluated by Dr. Shonka at UVA, who noted that he was "doing well with no evidence of ongoing infection and epitheliazation of the entire area. Completely healed at this point." ECF No. 83-5, at 46.

Rogers filed his original complaint against Defendants Dr. David MacDonald and Health Services Administrator Tanya Landrum on February 27, 2017; the amended complaint was filed on October 18, 2017. ECF No. 1; ECF No. 45. Rogers brought seven claims against Defendants, two of which have been voluntarily dismissed. Of the five remaining claims, three have been brought pursuant to 42 U.S.C. § 1983. The remaining two, Counts VI and VII, allege Rogers is entitled to punitive damages and attorneys' fees; the success of these counts thus depends on the substantive allegations of Counts I, IV, and V. ECF No. 45.

Count I is an Eighth Amendment claim of deliberate indifference to a serious medical need. It alleges three bases of deliberate indifference: (1) that Dr. MacDonald "violated

Plaintiff's right to be free from deliberate indifference to his known serious medical need for the post-operative appointment scheduled for March 12, 2015 where the bolster sewn into his head was to be removed;" (2) that "Dr. MacDonald further violated this right when he refused to follow the surgeon's instructions that restricted Plaintiff's load bearing activity by allowing Plaintiff to be housed in general population on the third floor—knowing that Mr. Rogers would be forced to carry his own body weight (which is way more than 10 pounds) up three flights of stairs to rest in his room, or go to the dining hall for each meal;" and (3) that "Dr. MacDonald further violated Plaintiff's right when he intentionally refused to house Plaintiff in the medical unit/infirmary until his wounds fully healed, instead kicking Plaintiff out of the infirmary on two occasions." ECF No. 45, at 32–33. Count IV alleges that Rogers was discharged from the medical infirmary on April 28, 2015 and returned to general population in retaliation against his exercise of his First Amendment rights to file administrative grievances. Id. at 37. Finally, Count V also alleges a First Amendment claim of retaliation under a theory of supervisory liability—Rogers claims that his wounds were scrubbed until they bled by Nurse Carter and that Dr. MacDonald and HSA Landrum failed to intervene. Id. at 38.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings,

5

depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that

6

"there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### III.

Count I alleges a violation of the Eighth Amendment, vindicated through a § 1983 claim. Under § 1983, Rogers must show (as a threshold matter) that each Defendant was personally involved in the alleged violation. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) ("Although § 1983 must be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions,' [citation omitted], [l]iability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights. The doctrine of respondeat superior has no application under this section.").

To prove an Eighth Amendment violation, Rogers must show that he suffered a sufficiently serious deprivation and that Defendants acted with "deliberate indifference" to his health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted). Inmates must "show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). Deliberate indifference requires "a higher degree of disregard than mere negligence." Farmer, 511 U.S. at 837. A prison official "must both be

aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw that inference." Brice v. Virginia Beach Correctional Center, 58 F.3d 101, 105 (4th Cir. 1995).

## A.

Rogers alleges under Count I that Dr. MacDonald violated his rights by failing to ensure that the surgical foam bolster was removed in a timely manner. Specifically, when UVA called to reschedule the March 12 appointment to March 17, Dr. MacDonald failed to ensure that Rogers made it to that appointment. Instead, Rogers was seen by Dr. Landauer on March 13 and 19 and was taken to UVA on March 20. Rogers asserts that this delay constitutes deliberate indifference on Dr. MacDonald's part because he knew that infection could result from a failure to remove the foam bolster in a timely manner. ECF No. 83-7, at 27. Rogers notes that Dr. MacDonald reviewed and signed Rogers's post-operative discharge instructions, and thus knew that the foam bolster was to be removed within a few days of surgery. Rogers asserts that Dr. MacDonald knew the follow-up appointment was being rescheduled but failed to take steps to ensure the appointment was kept and the bolster removed so as to avoid infection. In essence, this is a case about a missed appointment, and Rogers claims that Dr. MacDonald was deliberately indifferent by failing to make sure the follow-up appointment at UVA was made and kept.

Defendants respond that Dr. MacDonald showed no deliberate indifference because (1) he did not delay or interfere with Rogers's access to outside care; (2) he had no constitutional duty to reschedule Rogers's follow-up appointment; and (3) Dr. MacDonald properly treated Rogers's wounds at ACC. Dr. MacDonald examined Rogers on March 11

8

and noted no signs of infection. Dr. MacDonald was aware that the March 12 follow-up appointment at UVA was being rescheduled, and that Rogers would be seen by his colleague Dr. Landauer on March 13. Defendants assert that no reasonable jury could find from these facts that Dr. MacDonald demonstrated deliberate indifference to Rogers's medical needs. The court agrees.

As a threshold matter, Rogers fails to show any personal involvement by Dr. MacDonald in the scheduling, or failure to schedule, Rogers's follow-up appointment. Because § 1983 does not permit respondeat superior claims, Rogers must present enough evidence to show that Dr. MacDonald was personally involved in the scheduling of follow-up appointments and in ensuring that patients were taken to their appointments. Dr. MacDonald testified that he was not personally involved in setting or rescheduling Rogers's March 12, 2015 appointment. ECF No. 83-7, at 22. In HSA Landrum's deposition, she identified Faith Simmons as ACC's scheduler and says that, when an outside appointment needs to be scheduled, the doctor sends a referral form to the scheduler, who then takes care of the entire scheduling process. ECF No. 92-3, at 15. HSA Landrum also testified that post-operative appointment dates are usually "sent back" from the outside hospital to ACC, meaning that doctors at ACC are not involved in their scheduling even to the extent of passing along a referral form. ECF No. 83-3, at 203.

While personal direction or actual knowledge and acquiescence can constitute personal involvement, no facts indicate that Dr. MacDonald had actual knowledge of any failure in scheduling. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3rd Cir. 1988) ("Personal involvement can be shown through allegations of personal direction or of actual

knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."). Rogers's follow-up appointment to have his bolster removed was originally set for March 12, 2015, but UVA had to reschedule. While Dr. MacDonald was aware the rescheduling of the appointment was pending, his examination of Rogers revealed no symptoms indicating any complications with Rogers's graft site. Dr. MacDonald also knew that Rogers was scheduled to see his colleague, Dr. Landauer, on March 13. Rogers missed the March 17 appointment, but there is no evidence that Dr. MacDonald knew this, as it is undisputed that Rogers was being treated by Dr. Landauer during this period. In fact, Dr. MacDonald was not informed of any problem with Rogers's bolster or a missed appointment until after the second surgery was completed on March 23.

Given Dr. MacDonald's lack of personal involvement, there is insufficient evidence from which a reasonable factfinder could find deliberate indifference. The court takes guidance from Perrey v. Donahue, 703 F. Supp. 2d 839, 847 (N.D. Ind. 2010), in which a prisoner alleged a violation of his Eighth Amendment rights under § 1983 against the health services administrator for "failing to facilitate the scheduling and completion of a liver biopsy." The court found that the HSA "was not involved in the process of scheduling offenders for outside treatment or procedures." Id. at 846. The process described for scheduling such appointments is very similar to the process at ACC—the medical secretary or scheduling assistant received a consultation request from the treating physician, which was faxed to the corporate office of the Prison Health Services for approval. Id. At that point the medical secretary scheduled the appointment. Id. The HSA was never personally

10

involved. Id. The court ruled that, even if facts existed to suggest the HSA personally participated in the prisoner's medical care, deliberate indifference to a serious medical need was a high standard that could not be met. Id. at 847. The court granted summary judgment and dismissed the § 1983 claim against the HSA. Id. at 862.

While Rogers is no longer alleging Count I against HSA Landrum, Perrey illustrates the sort of personal involvement necessary to constitute deliberate indifference under the Eighth Amendment. See 703 F. Supp. 2d at 846. At ACC, a doctor's only involvement in scheduling outside appointments was passing along a referral form to the scheduler. After this point, doctors had no role in scheduling any further outside appointments—all follow-up appointments originated from the outside clinic. Dr. MacDonald wasn't any more involved in scheduling Rogers's post-operative appointment than HSA Landrum.

Farmer requires that a defendant in a claim of deliberate indifference be aware of all facts indicating a risk of serious injury, draw the inference of a threat to the plaintiff, and then ignore this risk. 511 U.S. at 837. Nothing in the record shows that Dr. MacDonald appreciated a significant risk of serious injury and consciously disregarded it. Dr. MacDonald saw Rogers on March 11 and noted no sign of infection. Although he did not know precisely when the foam bolster would be removed at UVA, he knew Rogers would be seen by Dr. Landauer in two days, on March 13. Given this, no reasonable factfinder could find that Dr. MacDonald was deliberately indifferent to Rogers's need to have his foam bolster removed.

**B.**

Rogers next alleges that Dr. MacDonald violated his Eighth Amendment rights by allowing him to ascend stairs to access his cell in general population. Rogers alleges that this

was in clear violation of his post-operative orders stating he should not carry any object over 10 lbs. Rogers argues that because his own body weight exceeds 10 lbs., requiring him to ascend and descend stairs forced him to carry that weight and violated the post-operative orders issued to aid his recovery. Defendants argue that the only reasonable interpretation of UVA's post-operative order preventing Rogers from lifting more than 10 lbs. is that Rogers was not allowed to carry foreign objects weighing more than 10 lbs., which would not include body weight.

Again, Farmer requires a defendant be subjectively aware of a risk to the plaintiff and then disregard this risk. 511 U.S. at 837. Leaving aside whether climbing stairs posed a significant risk to Rogers's recovery, there is no evidence in the record that Dr. MacDonald was aware of any such risk. Indeed, Dr. MacDonald testified in his deposition that he believed he was obeying Dr. Shonka's discharge orders when he discharged Rogers back to his cell in general population. ECF No. 83-7, at 46–47. Dr. MacDonald interpreted the discharge orders stating Rogers must not lift more than 10 lbs. as referring to foreign objects, rather than his own body weight.[1] Id. Nothing in the record indicates that this was pretense. As Dr. MacDonald was not aware of any risk to Rogers, Rogers cannot make a claim of deliberate indifference. See Farmer, 511 U.S. at 837 (stating that, to hold a prison official liable under the Eighth Amendment, the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must draw the inference).

---

[1] This seems to be the logical interpretation, as otherwise, Rogers would be permitted no activity and would be restricted to bed rest—something that Dr. Shonka presumably would have stated explicitly.

12

Moreover, the Fourth Circuit has held that a jail doctor can disagree with an outside specialist's diagnosis and treatment plan for an inmate without his or her actions constituting deliberate indifference. In Jackson v. Lightsey, 775 F.3d 170, 178–79 (4th Cir. 2014), an inmate alleged deliberate indifference to a serious medical condition when a jail doctor diagnosed him with heart arrhythmia, despite the inmate's production (or offer to produce) medical records showing a cardiologist had previously diagnosed and treated him for a more serious condition. The Fourth Circuit ruled that even if the doctor's diagnosis was mistaken, it was essentially a disagreement between an inmate and a physician over proper medical care. Id. Further, the doctor's erroneous diagnosis and treatment could represent a deviation from the accepted standard of care and still not constitute deliberate indifference. Id. at 179.

Dr. MacDonald's actions do not even approach the level of deviation shown by the defendant in Jackson. See 775 F.3d at 178. Indeed, Rogers's expert Dr. Rupe conceded that his actions do not constitute a departure from the standard of care.[2] ECF No. 83-6, at 83. As such, Rogers has shown no evidence that Dr. MacDonald's action in allowing Rogers ascend stairs constitutes deliberate indifference to a serious medical risk.

## C.

Finally, Rogers contends that Dr. MacDonald showed deliberate indifference to Rogers's medical needs when he discharged him from the medical infirmary after his initial surgery at UVA (whether this was March 6 or March 9) and on April 28, a month after his second surgery. This allegation is closely related to the allegation above (as it was the

---

[2] When asked if Dr. MacDonald committed any specific acts of negligence besides his "failure to assure that [Rogers's] outside appointment...occurred," Dr. Rupe answered, "No." ECF No. 83-6, at 83.

discharge that necessitated Rogers's use of stairs) and fails for the same reason. Apart from failing to show deliberate indifference, Rogers has shown no harm as a result of being discharged from the infirmary. Rogers's own expert acknowledges that his presence in general population and use of the stairs had no impact on his recovery.[3] ECF No. 83-6, at 79. In the Eighth Amendment context, only "extreme deprivations" suffice in a conditions-of-confinement claim. Arnold v. S.C. Dep't of Corr., 843 F. Supp. 110, 113 (D.S.C. 1994). Summary judgment as it pertains to Count I is therefore **GRANTED**. Count I is **DISMISSED**.

## IV.

Count IV is a retaliation claim under the First Amendment, again brought via § 1983. The First Amendment includes the right to be free from retaliation by a public official for the exercise of free speech. See ACLU v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."). However, as the Fourth Circuit has explained, not every response to an individual's exercise of his First Amendment right to free speech is actionable retaliation. See DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995) ("Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory."). Rather, to prove this retaliation claim, Rogers must demonstrate that the Defendants' actions improperly limited his right to file grievances. See Wicomico County,

---

[3] Dr. Rupe was asked if she felt that Rogers's second surgery was affected by his walking up and down stairs at certain points after his first surgery, and she answered, "I do not feel it was. No." ECF No. 83-6, at 79.

14

999 F.2d at 785 ("In order to state a retaliation claim, [plaintiffs] are required to show that [defendant's] actions adversely impacted these First Amendment rights.").

Under these general principles, courts follow a three-part test. "First, the plaintiff must demonstrate that his or her speech was protected." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685-86 (4th Cir. 2000) (citing Huang v. Board of Governors, 902 F.2d 1134, 1140 (4th Cir. 1990)). "Second, the defendant took an action that adversely affected that protected activity." Booker v. S.C. Dept's of Corr., 855 F.3d 533, 537 (4th Cir. 2017). "Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action." Suarez Corp. Indus., 202 F.3d at 686 (citing Huang, 902 F.2d at 1140). Notably, the Fourth Circuit has held that "[t]he causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015) (alterations in original) (citations omitted).

Rogers alleges that he was discharged from the medical infirmary in retaliation for the filing of grievances and complaints about HSA Landrum and the nursing staff. Rogers claims this action would deter a person of normal resolve from filing grievances and thus Dr. MacDonald and HSA Landrum are liable for retaliating against him for exercising his First Amendment rights. Defendants respond that Dr. MacDonald released Rogers back into general population for medical reasons, that HSA Landrum was uninvolved in housing assignments, and that Rogers's right to file grievances wasn't negatively impacted by the discharge.

Defendants concede that the filing of grievances is protected speech under the First Amendment. This fulfills the first prong of the above test assessing retaliatory conduct. The only remaining questions are whether the action taken by Dr. MacDonald and HSA Landrum was adverse to Rogers's First Amendment rights and whether there was a causal connection between Rogers's filing of grievances and his housing assignment.

In her deposition, HSA Landrum testified that she had no role in inmates' housing assignments and that only doctors could order the discharge of a patient from the infirmary. ECF No. 83-3, at 56. Rogers presents no evidence to the contrary. HSA Landrum therefore had no personal involvement in the alleged retaliation.

As to Dr. MacDonald, there is no evidence causally linking Rogers's filing of grievances and the decision to discharge him from the medical infirmary. Rogers seeks to infer causation from three facts: (1) his removal from the infirmary on April 28 was not recorded in the medical record, as other placement orders were, (2) Dr. MacDonald offered no reason for the April 28 removal in his deposition, but only provided one in his declaration supporting the motion for summary judgment, and (3) Rogers was moved back to the infirmary only three days later, where he remained for another three weeks. These facts are insufficient to support a finding of causation. The absence of a notation in the medical record provides no basis to suggest that Rogers's discharge came because of any grievance he filed. Indeed, given Rogers's consistent pattern of filing grievances during the period, the transfer back to the infirmary three days later suggests just the opposite.

With regard to Dr. MacDonald's rationale, he states in his declaration in support of summary judgment that a medical reason for discharging Rogers on April 28 was that there

were higher rates of infection in the infirmary and Rogers had suffered one infection already. ECF No. 83-2, at 2. While this explanation does not appear in the record before Dr. MacDonald's declaration, Dr. MacDonald was never directly asked during his deposition why he discharged Rogers on April 28. However, in response to Rogers's April 29 emergency grievance complaining of the discharge, Dr. MacDonald responded, "Due to limited beds, you are the healthiest person in the infirmary." ECF No. 83-10, at 3. This explanation for the discharge is not inconsistent with that offered in Dr. MacDonald's declaration in support of summary judgment. That Dr. MacDonald offers two complementary, but not identical, explanations for discharging Rogers would not permit a reasonable juror to infer retaliation against Rogers for his complaints.

Moreover, the record demonstrates that the discharge had no impact on Rogers's ability to file grievances. As Defendants point out, Rogers's rate of filing grievances changed little from month to month in the time surrounding the alleged retaliation. Rogers filed four grievances and complaints in March, four in April, two in May, three in June, three in July, and four in August. See generally ECF No. 83-10. This timeline does not suggest the existence of evidence (circumstantial or otherwise) of retaliatory action in April resulting in an adverse impact on Rogers.

Rogers points out that "[a] plaintiff's 'actual response to the retaliatory conduct' is not dispositive of the question of whether such action would likely deter a person of ordinary firmness." Martin v. Duffy, 858 F.3d 239, 250 (4th Cir. 2017) (quoting Constantine, 411 F.3d at 500). This is true, but the court does find Rogers's reaction and sentiments to be indicative of what an ordinary response might be, and very indicative of the impact of the discharge.

17

See Daye v. Rubenstein, 417 Fed. App'x 317, *319 (4th Cir. 2011) (affirming the dismissal of a claim of retaliation as the plaintiff continued to file grievances and then filed a lawsuit after the supposed retaliatory action by prison officials) ("[The plaintiff] failed to demonstrate that the conduct of prison officials adversely affected his constitutional rights. [The plaintiff] proceeded to file written grievances on the issue and then filed this lawsuit."). Rogers's sentiments here indicate that he felt undeterred by his discharge from the infirmary. Indeed, when asked during his deposition if he felt that his ability to file grievances was being interfered with, Rogers responded that he did not ever feel this way. ECF No. 83-1, at 109. Rogers has thus failed to show either a causal connection between his filing of grievances and Dr. MacDonald's or HSA Landrum's actions, or an adverse impact from the discharge. Accordingly, Defendants' motion as it pertains to Count IV is **GRANTED** and Count IV is **DISMISSED**.

## V.

Count V asserts supervisory liability of Dr. MacDonald and HSA Landrum for the actions of Nurse Carter. Because § 1983 does not recognize liability based upon respondeat superior, "[f]or prison officials to be held liable under § 1983 for constitutional injuries inflicted by their subordinates, an inmate must establish that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable' risk of constitutional injury; (2) the supervisor's response to this knowledge was so inadequate as to show 'deliberate indifference or tacit authorization' of the offensive practices; and (3) there was an 'affirmative causal link' between the supervisor's

inaction and the particular constitutional injury suffered." Wilkins v. Upton, 639 Fed. App'x 941, 945 (4th Cir. Mar. 2, 2016) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)).

Rogers alleges that Nurse Carter scrubbed his wounds until they bled for the purpose of discouraging his grievance and complaint filing.[4] Defendants contest this and argue that there is no record that Nurse Carter ever breached the standard of care. Whether Nurse Carter committed the alleged abuse does not affect the court's decision—Rogers presents no evidence of a causal link between HSA Landrum's or Dr. MacDonald's action or inaction and Nurse Carter's treatment of Rogers.

Rogers filed a number of complaints regarding Nurse Carter, including her treatment of his wounds. See ECF No. 83-3, at 200–201. HSA Landrum responded to these complaints, discussing some of them in person. Id. While Nurse Carter's wound cleaning was not discussed in person, HSA Landrum's written response encouraged Rogers to contact her if there were any further issues. Id. This response does not indicate tacit authorization of or deliberate indifference towards any alleged abuse. HSA Landrum further testified in her deposition that her role as HSA only involved communication with doctors or with the director of nursing and that she never told Nurse Carter how to treat inmates or directed her in any way. Id. at 54. Rogers has elicited no evidence showing an affirmative causal link between HSA Landrum's actions or inactions and Nurse Carter's wound treatment.

---

[4] Rogers does not allege a specific date on which Nurse Carter committed the alleged abuse but filed his offender request complaining of the abuse on April 22, 2015. ECF No. 83-1, 125.

Similarly, Dr. MacDonald had limited knowledge of Nurse Carter's actions as they pertained to Rogers, and Rogers has shown no evidence of a causal link between Dr. MacDonald's action and Nurse Carter's alleged abuse. Dr. MacDonald did, however, examine Rogers's wounds on several occasions shortly after Nurse Carter cleaned them and found no evidence of abuse. ECF No. 83-2, at 1–2. Rogers fails to establish either HSA Landrum's or Dr. MacDonald's awareness of the issue or any affirmative causal link between their supervision and Nurse Carter's activity. For this reason, Count V fails. Defendants' motion for summary judgment is **GRANTED**.

**VI.**

For the reasons stated above, Counts I, IV, and V fail. Counts V and VI are dependent upon the substantive allegations of Counts I, IV, and V and thus also fail. Defendants' motion for summary judgment is therefore **GRANTED**. All counts remaining in Rogers's amended complaint are **DISMISSED**.

An appropriate Order shall be issued today.

Entered: 01/16/2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge